***********
Upon review of all of the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission upon reconsideration of the evidence reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant-employer.
3. Hartford Insurance Company was the carrier on the risk.
4. Plaintiff's average weekly wage was $245.56, yielding a compensation rate of $163.71.
5. Plaintiff sustained a compensable work-related injury on 4 February 1997, while employed by defendant-employer. This claim was accepted pursuant to the filing of a Form 60 on 4 March 1997.
6. Defendants filed a motion directing plaintiff to comply with medical treatment pursuant to N.C. Gen. Stat. § 97-25 on or about 31 August 2000. The Executive Secretary entered an Order stating that plaintiff was to comply with medical treatment as provided by defendants on 19 September 2000.
7. Defendants filed a Form 24 application seeking to suspend or terminate plaintiff's benefits for non-compliance with the Order from the Executive Secretary's office. An Administrative Decision and Order dated 29 November 2000, indicated a full evidentiary hearing was necessary in this case.
8. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 1. This documentation consists of records from New Hanover Regional Medical Center, Coastal Rehabilitation Hospital, Paradigm Health Corporation, Tangram, J. Wesley Walls, M.D., Home Health Hospice, Intracorp and Learning Services Corporation.
 ***********
Based upon the stipulations and the competent evidence from the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a 45 year old male currently residing with his brother, Gary Hornsby. Plaintiff received a high school diploma from Eisenhower High School in 1973 and subsequently attended San Bernidino Valley Community College. Plaintiff did not obtain a certificate, but instead focused his study on auto mechanics. Plaintiff was in the United States Marine Corps for four years until he was discharged as a sergeant in 1979. Plaintiff has been employed in several vocations, including alarm installation and auto mechanic type work, since his discharge from the military.
2. Plaintiff sustained a compensable injury by accident on 4 February 1997, while employed by defendant-employer as a construction worker. This claim was accepted pursuant to the filing of a Form 60 on 4 March 1997, and appropriate compensation benefits have been paid since that time.
3. Plaintiff was initially treated at the New Hanover Regional Hospital for approximately two weeks and underwent a craniotomy drainage of the temporal lobe hematoma, right partial lobectomy and tympanomastoidectomy.
4. Following plaintiff's injury, plaintiff was transferred to Coastal Rehabilitation Hospital and remained under their care until he was discharged April 25, 1997. When plaintiff was discharged from Coastal Rehabilitation Hospital, he was transferred to Tangram Ranch in San Marcos, Texas, for neuropsychological and cognitive therapy. Tangram Ranch is a rehabilitation center for brain injury patients. Plaintiff stayed at Tangram Ranch for approximately five months and was subsequently discharged at his own request because he wanted to return to North Carolina.
5. Upon plaintiff's return to North Carolina on or about 30 September 1997, he lived with his brother, Gary Hornsby, and Gary's wife, Donna. When plaintiff was discharged from Tangram Ranch, Home Health and Hospice care provided services through April or May 1998. After living with his brother and sister-in-law, plaintiff moved into a mobile home where he lived by himself.
6. While living on his own, plaintiff injured himself on three occasions, including cutting himself badly enough to require a trip to the hospital. Plaintiff's brother stated that while living without supervision, plaintiff did little to occupy his time. While plaintiff lived with his brother and sister-in-law he was not permitted to use the stove or the dishwasher, could not do his own laundry, needed assistance managing his money, shaving, and dressing appropriately, and needed reminding to take his medication and maintain personal hygiene.
7. After plaintiff's third injury, he moved back with his brother and sister-in-law. When plaintiff's son turned eighteen, he asked plaintiff to come out to California. Plaintiff's brother purchased the tickets and notified the airline that plaintiff might need assistance in changing planes. Plaintiff stayed with his son for approximately three months before returning to North Carolina in July 1998.
8. On a few occasions plaintiff made other trips to California and Las Vegas, Nevada, in order to visit other members of his family. Plaintiff traveled by bus and had to purchase tickets, complete bus transfers and provide his own meals; however, it is not clear from the record what amount of assistance from bus personnel and other passengers plaintiff required to accomplish these tasks.
9. Plaintiff returned to North Carolina in May 1999 and was subsequently admitted to the Learning Services Program in Durham, North Carolina on or about 19 May 1999. The Learning Services Program is a supported living environment for people with acquired brain injuries. The participants in this program are people who are very cognitively and physically disabled as well as people who are extremely highly functioning and able to live somewhat independently in an apartment setting.
10. Upon plaintiff's admission to the Learning Services Program, Ms. E. J. Harrill was assigned as plaintiff's caseworker. Plaintiff was evaluated and it was determined that he required medication for seizures and high blood pressure. His psychological examination revealed that plaintiff had "difficulty concentrating, mild difficulty relaxing and short term memory problems." In addition, plaintiff had a pre-existing, non-disabling history of alcohol abuse which pre-dated his injury. Plaintiff denied having any substance abuse problems and refused to enter any substance abuse programs.
11. Plaintiff was compliant during the initial weeks of the Learning Services Program; however, plaintiff's alcohol and substance abuse problems became a concern after this initial period. While Ms. Harrill established the goals of plaintiff living independently and obtaining gainful employment, his psychological consultant noted that plaintiff's inability to control his alcohol consumption made his living with even limited supervision likely to be "detrimental to [plaintiff]."
12. During October 1999, plaintiff signed himself out on multiple occasions and returned to Learning Services Program with the appearance of being intoxicated. Plaintiff began to refuse to participate in activities at Learning Services Program and kept beer in his apartment.
13. Plaintiff was counseled on multiple occasions that he would not be successful in the rehabilitation program if he continued to consume alcohol. However, plaintiff repeatedly demonstrated that he was unable to control his impulsive desire for alcohol. On one occasion, in the midst of a snowstorm, plaintiff indicated he wanted to leave in order to obtain beer. Learning Services Program was concerned about plaintiff's safety and advised him he could have a six-pack of beer in order to be able to keep him on campus.
14. During the period from January 2000 through June 2000, plaintiff was consuming alcohol during the great portion of the day. Plaintiff would get up and sign out in the morning, be gone all day and return to the facility clearly intoxicated. Plaintiff had two seizures in May 2000, which were related to his consumption of alcohol. Plaintiff was counseled regularly regarding his substance abuse and the need to attend a substance abuse program. Ms. Harrill advised plaintiff to attend Alcoholics Anonymous meetings. Plaintiff only went to the initial two meetings, then refused to go back.
15. Plaintiff agreed to participate in a substance abuse program and on 28 July 2000, plaintiff was admitted to Oakleigh. Plaintiff remained in the substance abuse program for approximately three days at which time he discharged himself. He was advised to take Antibuse, a drug which induces illness upon the consumption of alcohol, and to attend Alcoholics Anonymous meetings. Plaintiff refused to take the Antibuse and to attend Alcoholics Anonymous meetings.
16. Plaintiff continued to demonstrate an inability to control his impulse to drink alcoholic beverages. On 4 August 2000, plaintiff left the Learning Services Program Campus without signing out. A staff member went to the bus station and found plaintiff boarding a bus for Las Vegas. Plaintiff had been drinking and it was apparent it was not safe to travel. Plaintiff was brought back to campus. On 30 October 2000, the Learning Services Program found plaintiff on the side of the street intoxicated with a laceration to his head. Plaintiff was disoriented and was unable to identify his location.
17. Plaintiff was transported to Duke Medical Center and subsequently John Umstead for admission to their detoxification program. Plaintiff remained at this program until 15 November 2000. Plaintiff was discharged from the program and recommended to return to Learning Services and continue a substance abuse outpatient program.
18. Upon returning to Learning Services Program plaintiff was advised that he would have to agree not to sign out anymore and was going to have to remain on campus so they would be able to monitor his activities. Plaintiff refused and was discharged on 17 November 2000.
19. Nurse's notes provided by Intracorp, plaintiff's rehabilitation counselor, states that plaintiff "is not to be held responsible for decisions in any aspect of his life . . . he does not have the mental capacity for logical thinking or decision making." On 19 May 1999, plaintiff was evaluated by Dr. Tom Gualtieri of N.C. Neuropsychiatry. Dr. Gualtieri noted that plaintiff "is not a good judge of his problems." He further opined that plaintiff "has had behavior problems including agitation and sexually inappropriate behavior, and also significant cognitive problems, especially memory, attention, judgment, and insight." Dr. Gualtieri found that plaintiff's memory is "severely impaired" and that his inappropriate behavior "will prove to be a problem in the real world." He opined that "it is hard to think that [plaintiff] will be able to live independently at any point in the foreseeable future." The Full Commission gives great weight to Dr. Gualtieri's opinion on plaintiff's level of functioning.
20. While it appears that plaintiff is able to understand the requirements for rehabilitation services and that his consumption of alcohol will prohibit being able to obtain the goals set by the rehabilitation program, he has demonstrated repeatedly that he is unable to control his activities and comply with the rules of the Learning Services Program. Ms. Harrill testified that plaintiff cannot make decisions regarding what is in his best interests, and that his perception, reasoning, discrimination and recall deficits could impact his ability to follow the recommendations of his rehabilitation. Further, the Full Commission finds that plaintiff's short term memory loss and his inability to concentrate makes gainful employment unlikely at best.
21. Plaintiff's inability to comply with the rehabilitation requirements of the Learning Services Program is due to his brain injury and does not constitute a willful refusal to accept treatment. The greater weight of the medical evidence in this case shows that plaintiff, as a result of his brain injury, does not have the ability to act as a reasonable person in weighing his options and making reasoned decisions regarding his welfare.
22. On 4 October 2001, following the hearing before the Deputy Commissioner, plaintiff completed a substance abuse treatment program offered by the Department of Veteran Affairs. The Full Commission finds that plaintiff may benefit from participation in an in-patient structured living environment. Plaintiff's experiences at Tangram Ranch and early in his time at the Learning Services Program indicate that with an active structured program plaintiff can be prompted to engage in constructive activities and avoid the impulses that cause his circumstances to deteriorate. Therefore, the Full Commission recommends that plaintiff be considered for placement in an in-patient structured living environment to lessen his disability if plaintiff's doctor or other medical provider recommends such placement.
23. Based upon the opinions of Dr. Gualtieri and other evidence presented plaintiff is not able to work in the competitive job market and remains totally disabled.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. On 4 February 1997, plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Defendants accepted plaintiff's claim as compensatory and began payment of compensation in March 1997. N.C. Gen. Stat. § 97-29.
3. As a result of his compensable injury, plaintiff sustained a brain injury and is incapable of making rational decisions regarding his welfare or acting as a reasonable person in weighing medical options and making treatment decisions. Therefore, plaintiff does not possess the ability to willfully refuse to comply with medical treatment offered by defendants. For this reason, the Deputy Commissioner erred in suspending plaintiff's benefits for willfully failing to comply with medical treatment. Johnson v. Jones Group, 123 N.C. App. 219, 472 S.E.2d 587
(1996); N.C. Gen. Stat. § 97-25.
4. Plaintiff is entitled to have his benefits reinstated dating back to 17 November 2000, the date of the Deputy Commissioner's suspension of those benefits. N.C. Gen. Stat. § 97-25.
5. Plaintiff may benefit from an in-patient, structured living environment if recommended by his medical providers.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's compensation shall be reinstated beginning on 17 November 2000, and continuing until further Order of the Commission. Accrued compensation shall be paid in a lump sum, subject to attorney's fees approved below.
2. Defendants shall pay to plaintiff interest in the amount of 8% on those benefits which are owed since 17 November 2000.
3. Plaintiff's counsel is entitled to 25% of the compensation awarded in Paragraph 1. One fourth of the lump sum payment of past due benefits shall be paid directly to plaintiff's counsel. Thereafter, every fourth payment of benefits shall be paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
This the ___ day of March, 2003.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/____________ BUCK LATTIMORE CHAIRMAN